Filed 3/10/23; Certified for Partial Publication 4/3/23 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| GRFCO, INC., et al., | |
| Plaintiffs and Appellants, | E076823 |
| v. | (Super.Ct.No. RIC l906126) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | OPINION |
| Defendant and Respondent; | |
| DEPARTMENT OF INDUSTRIAL RELATIONS, DIVISION OF LABOR STANDARDS ENFORCEMENT, | |
| Real Party in Interest. | |

APPEAL from the Superior Court of Riverside County. John W. Vineyard, Judge. Affirmed.

Manning Construction Law and Kimberly J. Manning for Plaintiffs and Appellants GRFCO, Inc. and George Rogers Frost.

Tredway, Lumsdaine & Doyle and Brandon L. Fieldsted for Plaintiff and Appellant James Craig Jackson.

No appearance for Defendant and Respondent.

Lance A. Grucela for Real Party in Interest.

After an administrative hearing, the Department of Industrial Relations, Division of Labor Standards Enforcement (Division) debarred the following from acting as public works contractors:  (1) GRFCO, Inc. (GRFCO), a contractor; (2) George Rogers Frost, the principal in GRFCO; (3) Garcia Juarez Construction (GJC), a contractor and apparent alter ego of GRFCO; and (4) James Craig Jackson, the principal in GJC and an employee of GRFCO.[1]  The Division found that, in six instances, the contractors had violated apprenticeship requirements, and in two instances, Frost and Jackson had made false certifications under penalty of perjury.  The trial court denied the contractors' petition for administrative mandate.

The contractors appeal.  They contend that:

(1)  There is insufficient evidence that the apprenticeship violations were knowing.

(2)  There is insufficient evidence to support the false certification findings.

(3)  The contractors were debarred because they refused to join a union, in violation of the First Amendment.

---

[1]     In discussing events leading up to this appeal, we will use "contractors" to refer to all four.  GJC, however, is no longer in business and did not appeal.  Hence, in discussing events during this appeal, we will use "contractors" to refer only to GRFCO, Frost, and Jackson.

(4)  The Division, the hearing officer, and/or the investigator were biased.

(5)  The hearing officer erred by denying the contractors' request to reopen, which was based on new evidence of bias.

We find no error.  Therefore, we will affirm.

I

DEBARMENT OF PUBLIC WORKS CONTRACTORS

"Debarment excludes an individual or entity from doing business with the government as a result of wrongful conduct or violations of a public contract or program. [Citation.]"  (*Southern Cal. Underground Contractors, Inc. v. City of San Diego* (2003) 108 Cal.App.4th 533, 542.)

A public works contractor must be registered.  (Lab. Code, § 1725.5.)[2]  To qualify for registration, it must, among other things, provide evidence that it "does not have any delinquent liability to . . . the state for any . . . penalties pursuant to any final judgment, order, or determination by a court or any federal, state, or local administrative agency." (§ 1725.5, subd. (a)(2)(C).)

If a public works contractor violates section 1725.5 with the intent to defraud, it can be debarred for from one to three years.  (§ 1777.1, subd. (a).)

Subject to exceptions not applicable here, a public works contractor must use one hour of apprentice work for every five hours of journeyman work.  (§ 1777.5, subds. (d),

_____

**2**      All further statutory citations are to the Labor Code, unless otherwise indicated.

3

(g).)  To that end, before starting work, it must send contract award information (form 140) to an apprenticeship program in the geographical area.  (§ 1777.5, subd. (e).) "Contractors who are not already approved to train by an apprenticeship program sponsor shall provide contract award information to *all* of the applicable apprenticeship committees." (Cal. Code Regs., tit. 8, § 230(a), italics added.)

The public works contractor must also send a request for apprentices (form 142) to an apprenticeship program in the geographical area, at least 72 hours (excluding Saturdays, Sundays and holidays) before the apprentices are to start work.  (Cal. Code Regs., tit. 8, § 230.1(a).)

"If the apprenticeship committee . . . does not dispatch apprentices as requested, the contractor must request apprentice dispatch(es) from another committee . . . in the geographic area . . . , and must request apprentice dispatch(es) from each such committee, either consecutively or simultaneously, until the contractor has requested apprentice dispatches from each such committee." (Cal. Code Regs., tit. 8, § 230.1(a).)  "[I]f . . . no apprenticeship committee dispatches . . . any apprentice . . . within 72 hours of [a timely] request (excluding Saturdays, Sundays and holidays) the contractor shall not be considered in violation." (*Ibid*.)

If a public works contractor knowingly commits a serious violation of section 1777.5, it can be debarred for up to one year for the first violation, or up to three years for any subsequent violation.  (§ 1777.1, subd. (d)(1).)

4

"The Labor Commissioner shall consider, in determining whether a violation is serious, and in determining whether and for how long a party should be debarred for violating Section 1777.5, all of the following circumstances:

"(A)  Whether the violation was intentional.

"(B)  Whether the party has committed other violations of Section 1777.5.

"(C)  Whether, upon notice of the violation, the party took steps to voluntarily remedy the violation.

"(D)  Whether, and to what extent, the violation resulted in lost training opportunities for apprentices.

"(E)  Whether, and to what extent, the violation otherwise harmed apprentices or apprenticeship programs."  (§ 1777.1, subd. (d)(2).)

II

STATEMENT OF FACTS[3]

GJC was a public works contractor.  Jackson was the owner, president, and responsible managing officer of GJC.  GJC shut down in March 2013.

---

[3]  At a debarment hearing, "[t]he formal rules of evidence shall not apply and any relevant evidence may be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of such evidence over objection in civil actions.  However, no determination shall be made based solely upon any evidence which would not be admissible, over objection, in a court of law in this state."  (Cal. Code Regs., tit. 8, § 16801(a)(2)(D).)

The contractors do not contend that any of the hearing officer's findings were based on evidence that would not be admissible in court.  We deem them to have forfeited any such contention.

GRFCO was also a public works contractor.  Frost was the owner, president, and responsible managing officer of GRFCO.  Jackson worked for GRFCO as a senior project manager.

Otherwise, however, GRFCO and GJC had the same staff.  In one instance, GRFCO asked to have GJC's work experience imputed to it.

Frost and Jackson's companies had completed many public works projects.  They had repeatedly received commendations from their clients and from members of the public praising their professionalism, expertise, ability to solve problems, and the high quality of their work.

A.      *Apprenticeship Violations*.

At all relevant times, there were two apprenticeship committees for laborers in the relevant geographic area:  Laborers Southern California Joint Apprenticeship Committee (Laborers) and Associated General Contractors of California, San Diego Chapter (Associated).[4]  This information was available on the Division's website.

Form 140 stated:  "[Y]ou must send [contract award] information . . . to ALL applicable apprenticeship committees . . . in the area of your public work.  Go to: http://www.dir.ca.gov/PublicWorksForms.htm for information about programs in your area . . . ."  Similarly, form 142 stated:  "Go to: http://www.dir.ca.gov/ PublicWorksForms.htm for information about programs in your area . . . ."

---

[4]      The contractors state that Associated was "recently formed."  There was no evidence of this.

Associated required contractors to join its organization; it would not dispatch apprentices to a contractor that was not a member.

1.    *Avocado Boulevard Project*.

From February 2012 through May 2013, GJC acted as prime contractor on a sewer replacement project in San Diego County called the Avocado Boulevard Project.

GJC sent forms 140 and 142 to Laborers, but not to Associated.[5]  Laborers did not dispatch any apprentices.  Thus, GJC did not employ any laborer apprentices on the project.

In November 2013, the Center for Contract Compliance (Center)[6] filed a complaint against GJC with the Division; it alleged failure to send forms to Associated and failure to employ apprentices.

The Center's complaint was served on GJC on or before November 8, 2013.  That would have made the contractors aware (if they were not already) that Associated existed and that there was at least an issue as to whether they needed to send forms 140 and 142 to it.  However, Jackson denied receiving the complaint.

---

[5]    The record includes what would appear to be forms 140 and 142 for the project, with certified mail receipts showing that they were sent to Associated. Nevertheless, Jackson admitted that GJC did not send these forms to Associated, and this admission is supported by other evidence.

[6]    Jackson testified that the Center was funded by the laborers union, and that "their job is to take out non[-]union contractors because we don't pay union dues."

7

In April 2014, the Division issued a civil wage and penalty assessment against GJC. GJC sought review. Jackson testified that he did not send the forms to Associated because, at the time, he was not aware of it.

The Director of Industrial Relations (Director) found that GJC "knowingly" failed to employ apprentices. However, for purposes of the amount of the penalty, she found that the violation was not intentional; rather, it "was technical noncompliance based on mistake." She assessed a penalty of $4,500.

### 2. *Euclid Street Project*.

Meanwhile, from February through March 2013, GRFCO acted as prime contractor on a sewer replacement project in Orange County called the Euclid Street Project.

GRFCO sent forms 140 and 142 to Laborers, but not to Associated. Jackson claimed he did not know that he had to send forms to more than one apprenticeship committee for a geographic area. However, someone at GRFCO claimed it did not send the forms because it believed that Associated did not operate in the geographical area.[7] Laborers did not dispatch any apprentices. Thus, GRFCO did not employ any apprentices on the project.

As a result, in December 2014, the Division issued a civil wage and penalty assessment against GRFCO. GRFCO requested review, but defaulted. In December

---

[7] This contradicted Jackson's subsequent testimony that he did not become aware of Associated until April 2014, when he received the penalty assessment for the Avocado Boulevard project.

8

2015, a judgment was entered against it for $2,700 (Euclid Street judgment). It did not pay the judgment until June 2016.

### 3. *E Street Project*.

From December 2013 through January 2014, GRFCO acted as prime contractor on a storm drain project in San Bernardino County called the E Street Project.

GRFCO sent forms 140 and 142 to Laborers, but not to Associated. It claimed it believed that Associated was not operating in the relevant geographical area. Laborers did not dispatch any apprentices. Thus, GRFCO did not employ any apprentices on the project.

As a result, in December 2014, the Division issued a civil wage and penalty assessment against GRFCO. GRFCO did not seek review. In December 2015, a judgment was entered against it for $3,800 (E Street judgment). GRFCO did not pay the judgment until June 2016.

Jackson testified that he understood that GRFCO had 60 days to pay a judgment — i.e., "after all rights of appeal had been exhausted[.]"[8] He also testified that GRFCO paid each of the judgments at issue within 60 days.

### 4. *Garfield Avenue Project*.

From February through July 2014, GRFCO acted as prime contractor on a sewer replacement project in Orange County called the Garfield Avenue Project.

---

[8] Jackson also testified, however, that he understood that he had no obligation to pay a judgment until there was a demand for payment, and even then he had 60 days to pay from the date of the demand.

GRFCO sent forms 140 and 142 to Laborers, but not to Associated. The requests specified a start date of July 27. The project, however, ended on July 3. Thus, GRFCO did not employ any apprentices on the project.

As a result, in December 2014, the Division issued a determination of civil penalty against GRFCO. GRFCO sought review. Jackson testified that he did not send a request to Associated because he believed that Associated was not operating in the relevant geographical area and did not provide laborers. He admitted that he had not checked the website. He argued that it would have been futile to send a request to Associated, because Associated would not send to a nonmember contractor. Jackson also testified that the erroneous start date was "probably" a clerical error by his assistant.

In March 2016, the Director found that GRFCO "knowingly" and "intentional[ly]" failed to employ apprentices. She assessed a penalty of $8,580 (Garfield Avenue assessment). In May 2016, GRFCO filed a mandate petition. In June 2017, the superior court denied a writ. GRFCO paid the assessment in July 2017.

5. *Feather Hill Project*.

In 2015, GRFCO acted as prime contractor on a storm drain project in Orange County called the Feather Hill Project.

GRFCO sent form 140 to Laborers and Associated. According to Jackson, he signed timely form 142s for both Laborers and Associated; his administrative assistant, however, inadvertently failed to send them. When he discovered this, on February 26, he sent them immediately; however, they were untimely for the specified start date of March

10

2. Meanwhile, he changed the actual start date to March 4. However, he did not send any new requests for apprentices for the new start date. Thus, GRFCO did not employ any apprentices on the project.

The Center filed a complaint against GRFCO with the Division. As a result, in December 2016, the Division issued a civil wage and penalty assessment against GRFCO.

GRFCO sought review. The Director found that GRFCO "knowingly" and "intentional[ly]" failed to employ apprentices. Jackson claimed that he did not send requests for apprentices because he believed the apprentice programs would not send apprentices to a "non-union shop." The Director, however, found this not credible, because Jackson also claimed that he intended to send the requests and failed to do so only because of his assistant's inadvertence. She assessed a penalty of $3,900.

6. *San Onofre Project*.

In 2015, GRFCO acted as prime contractor on a waterline replacement project called the San Onofre Project.

GRFCO sent forms 140 and 142 forms to both Laborers and Associated for the expected start date of the project. However, when the start date was delayed, it did not send any new form 142's for the new start date. Thus, GRFCO did not employ any laborer apprentices on the project.

11

Once again, the Center filed a complaint against GRFCO with the Division for its failure to employ apprentices on the project. As a result, in December 2016, the Division issued a civil wage and penalty assessment against GRFCO.

GRFCO sought review. The Director found that GRFCO "knowingly" failed to employ apprentices. For this and other violations, she assessed a penalty of $11,100.

B.   *False Certifications*.

1.   *2016 registration renewal*.

On May 18, 2016, GRFCO renewed its registration online. The renewal recited that Jackson was certifying, under penalty of perjury, that GRFCO did not have any delinquent liability to the state for any final judgments. At the time, however, GRFCO had not yet paid either the E Street judgment or the Euclid Street judgment.

2.   *2017 registration renewal*.

On June 12, 2017, GRFCO renewed its registration online. It recited that Frost was certifying, under penalty of perjury, that GRFCO did not have any delinquent liability to the state for any final assessments. At the time, however, GRFCO had not yet paid the Garfield Avenue assessment.

3.   *Circumstances of the renewals*.

Penney Paulson, an assistant project administrator for GRFCO, was the person who actually filed the registration renewals. She did so under Frost's and Jackson's names, at their direction, using their credit cards. At the time, she was not aware of the

12

unpaid judgments. She assumed that if there had been a judgment, GRFCO would have already paid it.

Jackson and Paulson both understood "delinquent" to mean past due, not merely due.

III

STATEMENT OF THE CASE

In May 2018, the Division filed a debarment action against GRFCO. In September 2018, a hearing officer held an evidentiary hearing.

In November 2019, the hearing officer found that the contractors had knowingly committed serious violations of the apprenticeship requirements for public works projects, in violation of section 1777.1, subdivision (d). She further found that Frost and Jackson had knowingly submitted false certifications under penalty of perjury with the intent to defraud the state, in violation of section 1777.1, subdivision (a). She ruled that they should be debarred for three years. Thus, the Labor Commissioner debarred them for three years, effective in January 2020.

In December 2019, the contractors filed an administrative mandate petition. The parties stipulated to stay the debarment order while the writ proceeding was pending. In March 2021, after hearing argument, the trial court denied the petition.

IV

MOOTNESS

The contractors were debarred for three years, effective January 2, 2020.

Accordingly, we questioned whether this appeal is moot.

We take judicial notice, however, that after March 30, 2021, when the trial court

entered judgment denying a writ of mandate, and after May 18, 2021, when we denied a

writ of supersedeas, the Labor Commissioner entered a new order debarring the

contractors for three years from May 21, 2021. Hence, the appeal is not moot.

V

THE SUFFICIENCY OF THE EVIDENCE OF

THE APPRENTICESHIP VIOLATIONS

The contractors contend that there was insufficient evidence that the

apprenticeship violations were knowing.[9]

A.    *Collateral Estoppel.*

In connection with four of the six projects, there was a prior finding that GJC or

GRFCO acted "knowingly." Each such finding had resulted in a penalty assessment

order  and, in one instance, in the entry of a judgment for penalties.

---

[9]    The Division does not respond adequately to this contention. It does not discuss the evidence on this point at all. It asserts, "Appellants do not dispute the Superior Court's confirmation that '[t]here is no question that Petitioners made knowing violations of Lab. Code § 1777.5 on all six of the enumerated projects.'" The contractors do argue, however, that to be "knowing," a violation must be willful and intentional, and that there was no evidence of this.

As the hearing officer noted, the penalty assessments "became final in all six projects and are not subject to review by the hearing officer in this matter."

"'Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings. [Citation.] Traditionally, we have applied the doctrine only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. [Citations.]' [Citation.]" (*Hernandez v. City of Pomona* (2009) 46 Cal.4th 501, 511.)

All of these requirements were met here. In particular, in each of the four former proceedings, Jackson claimed that the violation was committed ignorantly, inadvertently, or by mistake. Thus, the issue of whether the violation was "knowing" was actually litigated.[10] It was therefore established that the contractors had committed not just one, but four apprenticeship violations knowingly.

The Division did not have to prove that all six of the alleged violations were committed knowingly. Debarment required only a single knowing and serious

---

[10]    In connection with the other two projects — Euclid Street and E Street — the Division issued a penalty assessment, which required a determination that GRFCO have acted "knowingly." (§ 1777.7, subd. (a)(1).) However, GRFCO either did not seek review or defaulted, so arguably, this issue was not actually litigated. (See *Gottlieb v. Kest* (2006) 141 Cal.App.4th 110, 148-149.)

15

apprenticeship violation. (§ 1777.1, subd. (d)(1).) In determining whether the violation was serious, and in determining the length of the debarment, the hearing officer could consider, among other things, whether the contractors had committed other apprenticeship violations; however, the other violations did not have to be either knowing or serious. (§ 1777.1, subd. (d)(2)(B).) As long as the hearing officer determined that one of the knowing violations established by collateral estoppel was serious, she could also consider all of the other five.

B.    *The Evidence of the Apprenticeship Violations*.

Separately and alternatively, we also consider whether the evidence before the hearing officer established knowing violations, without resort to collateral estoppel.

As mentioned, a contractor can be debarred for a serious violation of the apprenticeship requirements only if the violation is committed "knowingly." (§ 1777.1, subd. (d)(1).) The contractors conflate "knowingly" with "intentionally" and/or "willfully." They state, "Section 1777.1(e) provides a definition of what constitutes an *intentional* (*willful*) violation under Section 1777.1(d)(2)(A) . . . ." (Italics added.) However, the contractors were sanctioned under section 1777.1, subdivision (d), which requires that a violation be committed *knowingly*. Section 1777.1, subdivision (b), which requires that a violation be committed *willfully*, is not involved here. Thus, the definition of "willfully" in section 1777.1, subdivision (e) likewise is not involved here.

Significantly, in determining the *duration* of the debarment, the Labor Commissioner is required to consider whether the violation was intentional or not.

16

(§ 1777.1, subd. (d)(2)(A).)  Evidently the Legislature contemplated that a violation could be knowing, yet not intentional.

The Labor Code does not define "knowingly."  However, under the Division's regulations, as they stood at the time:  "For purposes of Section 1777.7, a contractor knowingly violates Section 1777.5 if the contractor knew or should have known of the requirements of that Section and fails to comply, unless the failure to comply was due to circumstances beyond the contractor's control."  (Cal. Code Regs., tit. 8, former § 231(h), repealed Oct. 1, 2021.)

Admittedly, here, the question is whether the violations were knowing for purposes of section 1777.1, not section 1777.7.  However, section 1777.7 deals with whether to assess a monetary penalty for an apprenticeship violation; it requires that a violation be knowing.  Section 1777.1, subdivision (d) deals with whether to impose debarment for an apprenticeship violation; it requires that a violation be both knowing and serious.  "'"It is an established rule of statutory construction that similar statutes should be construed in light of one another [citations] and that when statutes are *in pari materia* similar phrases appearing in each should be given like meanings."'  [Citation.]" (*People v. Tran* (2015) 61 Cal.4th 1160, 1167-1168.)  It would be unreasonable to construe "knowingly" differently as between the two statutes.

      1.     *Avocado Boulevard Project*.

In connection with the Avocado Boulevard project, Jackson did not claim he was unaware of the requirement that he send forms 140 and 142 to all apprenticeship

17

committees in the geographical area. This requirement was stated on form 140 itself. Rather, he claimed only that he was unaware of Associated.[11] Again, however, forms 140 and 142 both stated that he could identify the apprenticeship committees in the geographical area by going to the website. He admitted that he did not check the website: "I just send it to the same ones that I always send it to . . . ." This was substantial evidence that (1) Jackson knew or should have known of the requirement; (2) he failed to comply; and (3) the failure to comply was not due to circumstances beyond his control. That was sufficient to satisfy the definition of "knowingly."

The contractors make much of the Director's findings that this particular violation "was not intentional" and that Jackson "made a mistake." As already discussed, however, a violation can be knowing, even though unintentional.

2.    *Euclid Street, E Street, and Garfield Projects*.

The Division conducted a single investigation regarding the Euclid Street, E Street, and Garfield projects combined.

This time, Jackson did not claim he had been unaware of Associated. Somewhat to the contrary, he referred to it as the "secondary apprenticeship" in the area. Moreover, someone at GRFCO — apparently not Jackson — indicated that GRFCO was aware of Associated but believed it was outside the geographic area.

---

[11]    The contractors claim, contradictorily, that in connection with the Avocado Street project, they did not send forms 140 and 142 to Associated *both* because Jackson was unaware of Associated *and* because Jackson believed Associated did not operate in the geographical area of the project. Jackson testified only to the first reason.

18

Jackson claimed he had been unaware of the requirement that he send forms 140 and 142 to more than one apprenticeship committee. Again, however, this requirement was stated on form 140. Moreover, in connection with the Avocado Street Project — which had started a year before the Euclid Street project — he had not made this claim; he had claimed only that he had not known Associated existed, thus implying that he *was* aware of the *requirement*. And again, the unnamed other person at GRFCO said it did not send the forms to Associated because it believed Associated was not in the geographic area. Amid this welter of conflicting explanations, the hearing officer was entitled to find that Jackson was aware of the requirement.

As Jackson was aware of the requirement and aware that Associated was the "secondary apprenticeship" committee in the geographic area, there was substantial evidence that the violation was knowing. Even assuming, however, he was unaware that Associated was in the geographic area, once again, he knew he could identify all of the relevant apprenticeship committees by going to the website. Thus, the violations were still knowing.

### 3. *Feather Hill Project*.

By the time of the Feather Hill project, Jackson was well aware, due to the investigations regarding previous projects, that he needed to send forms to Associated. He claimed that his administrative assistant "inadvertently" failed to send form 142 in a timely manner; when he learned it had not been sent, he rescheduled the project start date. However, he did not send a new form with the new start date. We may assume,

without deciding, that his assistant's failure was not knowing.  Even so, Jackson's own failure — to send a new form — was knowing.

### 4. *San Onofre Project*.

In connection with the San Onofre project, Jackson sent forms for the original start date.  However, when the start date was delayed, he did not send new forms.  This failure was knowing.

### 5. *All six violations, taken together*.

Finally, we reiterate, a single knowing and serious violation was sufficient to support debarment.  The contractors' only argument about any specific project is that their violation in connection with the Avocado Street project was not knowing.  They do not argue that their violations in connection with the Feather Hill and San Onofre projects — when they were admittedly aware of Associated — were not knowing.  Accordingly, even assuming there was insufficient evidence that the other four violations were knowing, the debarment order may stand.

### C. *"Serious" Violations.*

The contractors argue that there was insufficient evidence that the apprenticeship violations were serious.  They also argue that the requirement that a violation be serious is vague, in violation of due process.

This argument, however, does not have its own heading in their brief.  (See Cal. Rules of Court, rule 8.204(a)(1)(B).)  "A contention not appropriately raised in the

opening brief under a separate argument heading may be deemed forfeited. [Citation.]" (*Tukes v. Richard* (2022) 81 Cal.App.5th 1, 12.)

The contractors likewise forfeited their contention that "serious" is unconstitutionally vague by failing to raise it at the administrative hearing (*Basurto v. Imperial Irrigation Dist.* (2012) 211 Cal.App.4th 866, 892, fn. 6 ["due process . . . issues must be presented to the hearing officer or tribunal itself for the issue to be preserved."]) and again in the trial court (*San Diego Municipal Employees Assn. v. Superior Court* (2012) 206 Cal.App.4th 1447, 1462 ["'Under familiar general rules, theories not raised in the trial court may not be raised for the first time on appeal.'"]).

Alternatively, we also reject both arguments on the merits.

As mentioned, in determining whether an apprenticeship violation is serious, the hearing officer can consider "[w]hether the party has committed other violations of Section 1777.5." (§ 1777.1, subd. (d)(2)(B).) The evidence here showed six violations. This was sufficient evidence to support the finding.

Turning to the due process argument, "'a statute which either forbids or requires the doing of an act in terms so vague that [people] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.' [Citation.] Although even noncriminal legislation can be void for vagueness [citation], 'economic regulation is subject to a less strict vagueness test.' [Citations.]" (*Connor v. First Student, Inc.* (2018) 5 Cal.5th 1026, 1034.)

21

Here, section 1777.1 defines "serious" in terms of five specified factors, including, as noted, whether the party has committed other violations; it requires the hearing officer to balance those factors. Similar balancing tests have been held to be not unconstitutionally vague. (E.g., *In re Kavanaugh* (2021) 61 Cal.App.5th 320, 361 ["The parole criteria regulation specifies the factors that the Board, in its discretion, may weigh and balance during each individual prisoner's parole consideration proceeding. Therefore, the parole criteria regulation is not unconstitutionally vague."].)

On a related point, the contractors argue that it was futile to require them to send forms 140 and 142 to Associated, because Associated would not dispatch apprentices to them. They do not explain how this is legally relevant. The applicable statutes and regulations required them to do so. They do not contend that this requirement was so arbitrary or irrational as to violate substantive due process. It could have many rational purposes — e.g., to prove conclusively that the apprenticeship program will not send apprentices, or to inform the apprenticeship program about the demand for apprentices.

Section 1777.1, subdivision (d)(2) provides that, in determining whether a violation is serious or in determining the length of the disbarment, the Director can consider, among other things, whether the violation actually resulted in lost training opportunities for apprentices. The fact that it did not do so here is a mitigating circumstance. However, it is not determinative.

# VI

## THE SUFFICIENCY OF THE EVIDENCE

## OF THE CERTIFICATION VIOLATIONS

The contractors do not challenge the certification violations in the argument section of their brief; they challenge them only in the "Introduction." However, the argument is under a heading (albeit not one listed in the table of contents). We therefore consider it.[12]

As mentioned, to renew its registration, a public works contractor must "[p]rovide evidence" that it "does not have any delinquent liability to . . . the state for any . . . penalties pursuant to any final judgment, order, or determination by a court or any . . . administrative agency . . . . However, for purposes of this paragraph, the contractor shall not be disqualified for any judgment, order, or determination that is under appeal, provided that the contractor has secured the payment of any amount eventually found due through a bond or other appropriate means." (§ 1725.5, subd. (a)(2)(C).)[13]

---

[12] The Division is aware that the contractors are raising this issue, as it has responded. Its response, however, is inadequate. It argues only that (1) whether the judgment was delinquent was for the hearing officer to decide, and (2) the trial court upheld the hearing officer's decision. This fails to address the sufficiency of the evidence to support either the hearing officer's or the trial court's ruling.

[13] In a single sentence, the contractors assert that "the vague definition of 'late' makes this statute un-constitutional [*sic*]." The word "late," however, is not in any of the statutes involved.

Rather, the key word is "delinquent." (§ 1725.5, subd. (a)(2)(C).) The further provision allowing a contractor to obtain a delay by filing an appeal and posting a bond necessarily implies that payment is not delinquent at least until the end of the appeal

*[footnote continued on next page]*

GRFCO's registration application forms specifically stated, "Note: This statement does not include liabilities that are still within the appeal period or still under appeal."

The contractors assert, "It is un-disputed [*sic*] that the judgments were paid in full within 60 days." The cited portion of the record, however, establishes only that they were paid "eventually," not that they were paid within 60 days.

Actually, Jackson did testify that the Euclid Street and E Street judgments were paid within 60 days. The record, however, shows that they were entered in December 2015. Jackson testified vaguely that a mandate proceeding was brought to set them aside. However, there is no other evidence of such a mandate proceeding; in any event, a judgment could not properly be challenged in a mandate proceeding. The hearing officer was entitled to conclude that GRFCO did not actually challenge these judgments. And GRFCO did not pay them until June 2016.

In the Garfield Avenue case, the Director's decision was served in March 2016. If the contractors wanted to challenge it, they were required to file a mandate petition within 45 days after service. (§ 1742, subd. (c).) They did not do so. Instead, they filed a mandate petition belatedly, in December 2016. In June 2017, the trial court entered judgment denying the writ. As far as the record shows, it may have done so because the petition was untimely.

period, and longer if a bond is posted. The evidence shows that this is, in fact, how the Division construed "delinquent."

We may assume, without deciding, that the extension of time applicable to a decision that is "under appeal" (§ 1725.5, subd. (a)(2)(C)) applies to one that is the subject of a mandate proceeding. But that must be construed as limited to a valid mandate proceeding, not a belated and thus invalid mandate proceeding. And, in any event, there is no evidence that GRFCO had "secured the payment of any amount eventually found due through a bond or other appropriate means." (*Ibid.*)

VII

REFUSAL TO JOIN A UNION

The contractors contend that they were penalized because they refused to join a union, in violation of the First Amendment: As they put it: "To avoid assessments, even debarment, [the contractors] had to join the A[ssociated] G[eneral] C[ontractors] union."

The contractors claim Associated "will not send an apprentice unless the contractor joins the union." The only evidence supporting this is Jackson's testimony. However, he admitted that this was only an assumption on his part. The other evidence showed that Associated would not send apprentices to the contractors because they were not *members*, not because they were not *unionized*.

There is no evidence that Associated is a "union." Indeed, it would be a strange union that allowed employers to join. Arguably, however, the contractors have a First Amendment right not to join Associated, whatever kind of organization it may be.

Most important, the Division did not penalize the contractors for refusing to join Associated. The evidence showed that California Code of Regulations, title 8, section

25

230.1(a) is a safe harbor provision. All the contractors had to do was send forms 140 and 142 to all apprenticeship committees in the geographical area, including Associated. Then, if Associated refused to send apprentices to the contractors, the contractors would not be required to employ apprentices at all.

The contractors also claim the Center targeted them because they were nonunion. If the contractors were breaking the law, the Center had the right to report them to the Division. We know of no legal principle that prevents a citizen from reporting a crime just because the citizen reports crimes in a discriminatory manner. There was no evidence that the *Division* exercised its enforcement powers in a discriminatory manner. "[T]he unlawful administration by state officers of a state statute that is fair on its face, which results in unequal application to persons who are entitled to be treated alike, denies equal protection if it is the product of intentional or purposeful discrimination. [Citation.]" (*Baluyut v. Superior Court* (1996) 12 Cal.4th 826, 832; accord, *Snowden v. Hughes* (1944) 321 U.S. 1, 8.) Even assuming the Center intentionally discriminated against the contractors based on the exercise of their First Amendment rights, that intent is not imputed to the Division.

Under the general heading of this argument, the contractors also assert, in passing, that penalizing them for refusing to join a union violated sections 921 and 923. They forfeited this point by failing to "develop the argument . . . discussing the application of

26

relevant legal authority to the facts of this case." (*Gerlach v. K. Hovnanian's Four Seasons at Beaumont, LLC* (2022) 82 Cal.App.5th 303, 311-312.)[14]

Sections 921 and 923 do not apply. Section 921 prohibits an employer from agreeing with an employee that it will not join a labor organization or an employer organization. No such employer-employee agreement is involved here. Section 923 states a public policy that "[n]egotiation of terms and conditions of labor should result from voluntary agreement between employer and employees." This has no free-standing effect; it applies only "[i]n the interpretation and application of" certain specified sections of the Labor Code, none of which are involved here. And, of course, as we have already held, the contractors were not penalized either for refusing to join a union or for refusing to join Associated.

VIII

BIAS

The contractors contend that the Division and/or the hearing officer were biased, as manifested in five instances.

In their reply brief, however, the contractors *concede* that "the administrative record is devoid of any evidence of bias." They argue only that they should have been allowed to reopen to introduce evidence of bias. (See part IX, *post*). That concession is fatal to this contention.

---

**14** The contractors' reference to the National Labor Relations Act, in its entirety, with no analysis, is similarly forfeited.

27

Nevertheless, if only out of an excess of caution, we address it on the merits.

A.     *Delay in Investigation.*

1.     *Additional factual background*.

In June 2012, Jamie Roberts of the Center asked Associates whether it had received forms 140 and 142 for the Avocado Boulevard project. She added, "[N]o rush on this at all . . . the project won[']t be finished until fall and I don't plan on filing any apprenticeship complaints (if applicable) until project completion."

In March and May 2013, the contractors finished work on both the Euclid Street project and the Avocado Boulevard project.

In November 2013, the Center filed its first complaint, about the Avocado Boulevard project.

The contractors view this delay in filing as hiding the ball — keeping them ignorant of the existence of Associated and thus entrapping them into noncompliance on the Euclid Street and E Street projects.[15]

The only prosecution witness was Deputy Labor Commissioner Kari Anderson. She had investigated all of the contractors' alleged violations. She testified, "It was my duty to find violations against contractors."

---

[15]     Jackson testified that the Center's first complaint was not served on him, so he did not learn that Associated existed until April 2014, when the Division issued its first civil wage and penalty assessment. Thus, in the contractors' view, they were further entrapped into noncompliance on the E Street project, begun in December 2013, and the Garfield Avenue project, begun in February 2014.

Anderson also testified that she "maintain[ed] objectivity" during her investigation. She had never spoken to Roberts, of the Center, about the contractors. She did not know whether the Center was either "biased" or "union-affiliated." The Center was "the complainant"; however, the Division conducts an "independent investigation."

Anderson did not know why the Center had delayed filing its complaint. She noted, however, that the contractors had until the end of a project to fulfill their obligation to employ apprentices, implying that they were not in violation (or could still cure a violation) until then.

2.    *Discussion*.

The contractors offer the delayed filing as an instance of the Division's bias. They assert that the Center *and* the Division delayed the investigation. They also assert that "Anderson worked closely with the C[enter] to target the contractors." (Bolding omitted.)

There is evidence that the Center delayed. However, there is no evidence that the Division did, or that the Division was working with the Center, except in the way that any prosecuting agency would work with any witness or reporting party.[16]

The contractors also complain that the Division knew there were two apprentice committees in the geographic area, but "did not notify" them. The Division had no duty to notify them. At the top of every form 140 and 142, there was a notice that the

---

[16]    To the extent that the contractors base this argument on evidence submitted with their request to reopen, we discuss that evidence in part IX, *post*.

29

contractors could go to the Division's website "for information about programs in your area . . . ." That was more than the Division was required to do.

B.  *Working Relationship Between the Hearing Officer and the Investigator.*

1.  *Additional factual background.*

The hearing officer was an attorney in the Labor Commissioner's office.[17]  Before the hearing, the contractors moved to disqualify her.  They argued that "an agent of the Labor Commissioner is not qualified to serve as hearing officer in a debarment proceeding prosecuted by another agent of the Labor Commissioner."  The hearing officer refused to disqualify herself.

2.  *Discussion.*

The contractors argue that Anderson and/or the hearing officer was biased.  They assert:  "Anderson would have obviously worked with [the] Hearing Officer . . . during her investigation and the drafting of the complaint against the contractors . . . ."  This is not "obvious[]" at all.  And the contractors do not cite any support for it in the record.

The contractors do not mention the hearing officer's stated reasons for refusing to disqualify herself.  She wrote:  "The regulations which govern debarment hearings do not prohibit an attorney from [the Division] from also serving as a hearing officer in this type

---

[17]  The contractors assert that the hearing officer had been a prosecutor:  "[The] hearing officer . . . went from being a prosecutor at the D[ivision] to now being the hearing officer for the contractors . . . ."  Their citation to the record does not support this, nor does anything else in the record.

Even if it were true, however, for the reasons we will discuss, it would not be material.

of proceeding.  Cal. Code Regs., [t]it. 8, [§] 16801.  In addition, a party is not denied an impartial adjudicator simply because an administrative entity performs both the functions of a prosecutor and judge.  *Southern Cal. Underground Contractors, Inc. v. City of San Diego*[, *supra*,]  108 Cal.App.4th [at p. ]549.”

The contractors also give short shrift to the trial court's reasons for rejecting their bias claim.  It ruled, in part, “the Administrative Procedure Act only requires disqualification of the presiding officer where:  ‘(1) The person has served as investigator, prosecutor, or advocate in the proceeding or its preadjudicative stage; or (2) The person is subject to the authority, direction, or discretion of a person who has served as investigator, prosecutor, or advocate in the proceeding or its preadjudicative stage.’ (Gov. Code § 11425.30.)  There is neither evidence, nor even suggestion, in the Administrative Record that the Hearing Officer participated ‘as investigator, prosecutor, or advocate’ in the present proceeding; nor is there any evidence in the Administrative Record that the Hearing Officer was subject to the ‘authority, direction, or discretion’ of the DLSE's advocate . . . .”

Like the hearing officer, it recognized that “‘[b]y itself, the combination of investigative, prosecutorial, and adjudicatory functions within a single administrative agency does not create an unacceptable risk of bias and thus does not violate the due process rights of individuals who are subjected to agency prosecutions.’ (*Morongo Band of Mission Indians v. State Water Resources Control Bd.* (2009) 45 Cal.4th 731, 737.)  In the absence of a financial interest in the outcome, hearing officers are presumed to be

31

impartial. (*Ibid.*) 'To prove a due process violation based on overlapping functions thus requires something more than proof that an administrative agency has investigated and accused, and will now adjudicate.' (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 221.)"

Both rulings were correct. Appellant asserts that the trial court refused to consider any kind of bias other than financial interest. Not so. It said that, in the absence of a financial interest, a hearing officer is presumed to be impartial. It did not preclude the contractors from attempting to overcome this presumption. However, they did not.

### C. *Restriction on Cross-Examination.*

#### 1. *Additional factual background.*

During her cross-examination, Anderson testified that a judgment is due when entered. She had trouble understanding a convoluted question about whether either of the judgments involved here was past due; the hearing officer sustained an objection that it was vague.

When counsel asked, "Was payment on any of the judgments past due?," the hearing officer sustained an asked-and-answered objection. However, in response to further questions, Anderson testified, "[E]ach day that the judgment is or is not paid, then it is past due." Counsel asked, "Who told you that?"; she said, "No one." He then asked, "Where did you get that understanding?" The hearing officer sustained an asked-and-answered objection.

Counsel asked, "When did you first make an inquiry relating to the false certification?" The hearing officer sustained an asked-and-answered objection.

Anderson admitted that, in connection with the Feather Hill and San Onofre projects, GRFCO did send forms 140 and 142 to Associated. Counsel then asked, "So you would agree with me, then, that after April 2014, there was corrective action taken by GRFCO with regard to sending forms 140 and 142 to AGC?" The hearing officer sustained an objection that this "calls for a legal conclusion about corrective action, quote/unquote, which is in the statute."

2.    *Discussion*.

The contractors cite the *pages* that these exchanges are on as instances of the hearing officer's bias.[18] However, they do not bother to tell us what those pages *show* — i.e., what questions were asked or what objections were made. A fortiori, they make no effort to show that the hearing officer's rulings were erroneous.

They were not. The "vague" question was vague, and the witness did not understand it. Anyway, she ultimately explained that, in her view, the judgments were past due as soon as they were entered. The "asked and answered" questions had been asked and answered. And again, counsel did get the information. The "legal conclusion"

---

[18]    In support of this point, the contractors also cite pages 201-203 of the reporter's transcript of the hearing (i.e., pages 1261-1263 of the administrative record). On those pages, however, the hearing officer did not sustain any objections or otherwise restrict the cross-examination.

question called for a legal conclusion as to whether sending the forms to Associated in connection with the last two projects constituted "corrective action."

In any event, "'a trial court's . . . rulings against a party — even when erroneous — do not establish a charge of judicial bias, especially when they are subject to review.' [Citation.]" (*People v. Farley* (2009) 46 Cal.4th 1053, 1110.)

### D. *Inability to Call the Labor Commissioner.*

#### 1. *Additional factual background.*

The contractors served a notice to appear (Gov. Code, § 11450.50) on then-Labor Commissioner Julie Su. The Division objected to the notice to appear; it argued that the contractors had not shown good cause to depose an agency head. It does not appear that the contractors made any further effort to compel the Commissioner's appearance.

#### 2. *Discussion.*

The contractors complain about their inability to call the Labor Commissioner, supposedly to prove that she was biased.

They forfeited this argument by failing to raise it before the hearing officer. (See *Lewis v. Superior Court* (2017) 3 Cal.5th 561, 578.) When the Division refused to produce the Labor Commissioner, the contractors simply dropped the matter.

They further forfeited this argument by failing to raise it in the trial court. (See *Lewis v. Superior Court*, *supra*, 3 Cal.5th at p. 578.) They did not mention it in their petition, in their opening brief, in their reply brief, or at the hearing.

Finally, they do not discuss whether they were actually entitled to call the Labor Commissioner; they do not mention what the Division's actual objections were. Much as the Division argued below, "a busy public official should not be required to give evidence in his or her official capacity in the absence of 'compelling reasons.'" (*Deukmejian v. Superior Court* (1983) 143 Cal.App.3d 632, 633.) As the contractors never raised the issue below, they never showed any compelling reasons to require her to appear.

Belatedly, they argue that she could have testified about (1) why the Division stepped up its enforcement of form 140 and 142 violations when she took office, and (2) what her relationship was to the Center or to "the labor union."[19] However, there was no evidence that the Division *did* step up enforcement,[20] and there was no evidence that she *did* have any such relationship. Thus, even now, the contractors have not shown any compelling reason to call the Labor Commissioner.

E.      *The Merits of the Case.*

The contractors argue that the hearing officer must have been biased because "[t]he basis for debarment is without merit." (Bolding omitted.) In part V, *ante*, we held that the debarment order is supported by sufficient evidence. In any event, we reiterate,

---

[19]      As the contractors use the word "union" loosely, it is not clear whether this means Associated, the laborers union, or some other organization.

[20]      The contractors state, "[T]he D[ivision] did not commence enforcement of apprenticeship requirements until late 2013." (Italics omitted.) The cited portion of the record does not support this.

35

the mere fact that a ruling is erroneous is insufficient to establish bias. (*People v. Farley*, *supra*, 46 Cal.4th at p. 1110.)

IX

REQUEST TO REOPEN

The contractors contend — sporadically, but throughout their brief — that the hearing officer erred by denying their request to reopen.

A.    *Additional Factual and Procedural Background*.

The hearing was held on September 6-7, 2018.

On October 25, 2019 — over a year later — the contractors filed a "request to reopen." (Capitalization altered.) In it, they asserted that on July 31, 2019, they had taken the deposition of Pierre Weakley, a former representative of the Center.[21] Allegedly, Weakley had testified that the Center "target[ed]" certain non-union contractors, including them. It had submitted bid protests against them, accompanied by evidence of multiple violations of apprenticeship requirements. Weakley admitted that he wanted to stop the contractors from getting the bids.

Weakley allegedly also testified that he asked the Division to start debarment proceedings against the contractors. Anderson had responded that the Division "wanted to wait until she finished up some pending cases." The contractors took this to mean the penalty assessment proceedings against them.

---

[21]    The contractors describe Weakly as "a senior investigator" for the Center, The record does not support this. They also describe him as a "lobbyist." Again, the record does not support this.

According to the contractors, Weakley had "a direct line of communication" with Anderson.[22]  They concluded that Weakley's deposition showed "a coordinated effort over a considerable period of time by Mr. Weakley and individuals at the [Division] including most notably Kari Anderson to develop multiple claims of apprenticeship violations against [the contractors] with the ultimate goal of debarment."

None of this was asserted under oath.  None of it was supported with excerpts from the deposition.  A number of emails and other documents were attached to the request, but they were not authenticated.

One email indicated that in 2017, the Center was "monitor[ing]" four contractors, including GRFCO.

Other emails indicated that, in 2018 and 2019, the Center submitted or helped others to submit bid protests against GRFCO.

One document was entitled "Case Summary 2017-2018."  It listed 61 cases against contractors that the Center had "sent" (inferably to the Division).  It included one case against GRFCO.  (Capitalization altered.)

The last document was entitled "CCC-DLSE Results (2019)."  (Capitalization altered.)  It listed 30 "assessments issued" against various contractors, including three against GRFCO.  (Capitalization altered.)[23]

---

[22]    It is not clear that this means any more than that he had her phone number.

[23]    The contractors call this a "target list" or "scoreboard."  They claim the Center created it "to keep track and tally assessments against non-union contractors to achieve the labor union's goal to eliminate the nonunion competition via debarment."

*[footnote continued on next page]*

37

As far as the record shows, the hearing officer never ruled on the request to reopen. On November 19, 2019, she issued her statement of decision.

B.    *Discussion.*

Once again, the contractors give short shrift to the trial court's stated reasons for rejecting this contention. It said:

"Petitioners cite no authority which required the Hearing Officer to reopen a hearing more than a year after the record was closed. (See . . . 8 CCR § 16801(a)(2)(I).) Moreover, in the context of a civil action, a court does not abuse its discretion when its refuses to reopen a case for new evidence that will not produce a different result. [Citation.] The evidence upon which Petitioners made their request attacks the D[ivision]'s motive in bringing charges against Petitioners, and in that regard, it is not relevant to any alleged bias or whether substantial evidence supported the Hearing Officer's Decision. Nor do Petitioners argue — let alone provide evidence — that they acted diligently. (See 2 Wilkin, Cal. Procedure (5th ed. 2008) Trial, § 166 [motion to reopen trial must be supported by a showing of good cause and due diligence].)"

"Petitioners' arguments are not so much a claim of bias as a complaint regarding the D[ivision]'s motive . . . . An improper motive of the agency bringing the charges, however, is not particularly relevant so long as there are sufficient facts introduced at the

_____

However, it does not show that the contractors listed were either (1) nonunion or (2) debarred. It does not even conclusively show (although it may be inferable) that it was the Center that reported these contractors to the Division. On its face, it appears to be merely a list of contractors who violated the law and were penalized.

38

hearing to support the decision. (See, e.g., *Pomona Valley Hospital Medical Center v. Superior Court* (1997) 55 Cal.App.4th 93, 107.)"

Even now, the contractors do not cite any authority allowing the hearing officer to reopen the hearing. In a debarment proceeding, "[a]t the conclusion of the hearing the Hearing Officer may take the matter under submission or allow the introduction of post hearing briefs." (Cal. Code Regs., tit. 8, § 16801(a)(2)(I).) This appears to leave no room for reopening. "[A] trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate . . . that the trial court committed an error . . . . [Citations.]" (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.) Because the contractors have not shown that the hearing officer had authority to reopen, in the face of a regulation suggesting she did not, we must presume she did not.

Likewise, the contractors do not claim that they acted diligently. The request was filed more than 13 months after the hearing. It was based on the deposition of Weakley, taken on July 31, 2019, yet the contractors did not move to reopen until October 25, 2019, some three months later. The trial court could reasonably conclude that this was not diligent.

We also note that the request to reopen was not supported by a declaration. Weakley's deposition was not attached. The documents that were attached were not authenticated. The request consisted entirely of counsel's *characterizations* of what Weakley had allegedly said and of the documents. Evidence at the hearing, however, had to be under oath. (Cal. Code Regs., tit. 8, § 16801(a)(2)(F).) While hearsay was

admissible (Cal. Code Regs., tit. 8, § 16801(a)(2)(D)), someone had to testify that the hearsay was said. "It is axiomatic that the unsworn statements of counsel are not evidence. [Citations.]" (*In re Zeth S.* (2003) 31 Cal.4th 396, 413, fn. 11.) In sum, there was no *evidence* supporting the request to reopen. The contractors calling the request "direct evidence" some 12 times does not make it such.

Last but not least, even assuming everything in the request to reopen was true, it did not show any improper bias, for two reasons.

First, it showed that Weakley and the Center were motivated by pro-union bias, but not that Anderson or the Division was.[24] For example, it alleged that there was a "coordinated effort" by Weakley and Anderson "to develop multiple claims of apprenticeship violations against [the contractors] with the ultimate goal of debarment." "[T]he D[ivision] and, in particular, Kari Anderson is using the [Center]'s targeting effort to facilitate its disbarment effort." For all this shows, Anderson's only motivation was entirely proper — to identify, penalize, and, when appropriate, debar violators.

Second, it did not show that the hearing officer was motivated by pro-union bias. The trial court cited a case on point, *Pomona Valley Hospital Medical Center v. Superior*

---

[24]     The contractors claim the Division's respondent's brief makes the "shocking revelation" that personnel of the Center "were paid investigators or employees of the D[ivision]." This is not supported by the cited portions of the respondent's brief nor by any other portion. We remind the contractors' counsel of her duty of candor (see also fns.4, 11, 17, 18, 20, 21, *ante*). (Rules Prof. Conduct, rule 3.3(a).)

*Court*, *supra*, 55 Cal.App.4th 93 (*Pomona*).**25** In *Pomona*, Dr. Knudsen, the head of a hospital's medical staff, suspended Dr. Bressman, a member of that medical staff. After a further investigation, by a committee that included Knudsen, the hospital refused to reappoint Bressman. (*Id*. at pp. 96, 99.) Bressman requested review by the hospital's Judicial Review Committee (JRC); it upheld the termination. (*Id*. at p. 97.) In subsequent administrative and judicial proceedings, Bressman maintained that he had been denied a fair administrative hearing because Knudsen was a competitor and had "fostered" the charges so he could take over Bressman's practice. (*Id*. at pp. 97-98.)

The appellate court held that Knudsen's motive was irrelevant to whether Bressman received a fair administrative hearing. (*Pomona*, *supra*, 55 Cal.App.4th at pp. 106-107.) "'[I]t is the bias of the tribunal deciding a case, not the bias of the person instituting the proceeding that is important.' [Citation.]" (*Id*. at p. 107.) "Although Knudsen suspended Bressman and was a member of the committee which recommended that Bressman's reappointment application be denied, Knudsen was not a hearing officer, a member of the JRC or a member of the appeal board of Pomona Valley's board of directors. Consequently, evidence of Knudsen's motive in *initiating* Bressman's suspension, and his subsequent actions with respect to the denial of Bressman's reappointment application [are] not relevant to the issue of whether Bressman had a fair administrative hearing. [Citations.]" (*Ibid*., fn. omitted; accord, *Dixon v. State Bar*

---

**25** This was a neat bit of research on its part. The Division had not cited *Pomona*.

41

(1982) 32 Cal.3d 728, 737; *Citizens Capital Corp. v. Cathcart* (1982) 136 Cal.App.3d 793, 799; *Cole v. Los Angeles Community College Dist.* (1977) 68 Cal.App.3d 785, 792.) Here, then, the Division's motive was irrelevant.

The contractors argue that evidence of cooperation between the Center and the Division was relevant for other purposes. They did not raise these arguments in the request to reopen or in the trial court. Therefore, they have forfeited them.

In any event, these arguments lack merit.

First, the contractors assert that Weakley and Anderson had "improper ex parte communications." Anderson was not a tribunal. She was an investigator. Investigators are allowed to talk to an accuser in the absence of the accused. In any event, this would not taint the hearing officer's decision.

Second, they claim that "calls, emails, and meetings between Weakley, [the Division's counsel,] and Anderson were illegal" under the Ralph M. Brown Act (Brown Act). (Gov. Code, § 54950 et seq.) The Brown Act did not apply because the Division is not a "local agency" and because neither the Division's counsel nor Anderson was a member of the Division's "governing body." (See Gov. Code, §§ 54952, 54952.2.) And again, this would not taint the hearing officer's decision.

Third, they suggest that Anderson "use[d] . . . public resources for personal or political purposes" in violation of Government Code section 8314. Again, however, the request to reopen did not so much as allege that Anderson had a pro-union bias. We also note that Government Code section 8314, subdivision (b)(4) defines "use" as "a use of

42

public resources which is substantial enough to result in a gain or advantage to the user or a loss to the state or any local agency for which a monetary value may be estimated." Even assuming Anderson had a pro-union bias, she had no gain, and the Division had no loss, "for which a monetary value may be estimated." And yet again, this would not taint the hearing officer's decision.

For all these reasons, the hearing officer could properly refuse to reopen the hearing.

X

DISPOSITION

The judgment is affirmed. The Division is awarded costs on appeal against the contractors.

RAMIREZ    <br>P. J.

We concur:

McKINSTER   <br>    J.

MILLER    <br>    J.

**CERTIFIED FOR PARTIAL PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| GRFCO, INC. et al.,<br>    Plaintiffs and Appellants,<br>v.<br><br>THE SUPERIOR COURT OF<br>RIVERSIDE COUNTY,<br>    Defendant and Respondent;<br><br>DEPARTMENT OF INDUSTRIAL<br>RELATIONS, DIVISION OF LABOR<br>STANDARDS ENFORCEMENT,<br>    Real Party in Interest. | E076823<br><br>(Super.Ct.No. RIC l906126)<br><br>ORDER CERTIFYING OPINION<br>FOR PARTIAL PUBLICATION |

THE COURT

The opinion in the above-entitled matter, filed on March 10, 2023, was not certified for publication in the Official Reports.

A request has been made, pursuant to California Rules of Court, rule 8.1120(a), for publication of the opinion. It appears that part of the opinion does meet the standard for publication as specified in California Rules of Court, rule 8.1105(c).

We therefore GRANT the request, in part, and ORDER that the opinion is certified for publication, with the exception of parts VI, VII, VIII.C, VIII.E, and footnote 12.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ
                                                                                            P. J.

We concur:
McKINSTER
                        J.
MILLER
                        J.

1

See attached mailing list
MAILING LIST FOR CASE: E076823
GRFCO, Inc. et al. v. The Superior Court; Department of Industrial Relations, Division of Labor Standards Enforcement


Superior Court Clerk
Riverside County
P.O. Box 431 - Appeals
Riverside, CA 92502


Kimberly Jo Manning
Manning Construction Law, Inc., APLC
4 Hutton Centre Drive, Suite 900
Santa Ana, CA 92707


Brandon Lloyd Fieldsted
Tredway Lumsdaine & Doyle LLP
2010 Main Street, Suite 1000
Irvine, CA 92614


Lance Arthur Grucela
Division of Labor Standards Enforcement
CA Dept. of Industrial Relations
7575 Metropolitan Drive, Suite 210
San Diego, CA 92108